Stewart, and may it please the Court, we are gathered together here because for the first time in a century of financial regulation, a conservator has claimed for itself the power not to conserve, ensuring that the companies can never be rehabilitated, and it has done so while it was unaccountable to any of the three branches of government envisioned by the founders. Now, I'm going to start my remarks today by talking about our statutory claims. There's no question the defendants haven't raised a question about our standing or about what the appropriate remedy would be under those statutory claims. In addition, there's common ground between the parties all agree that this Court is empowered to enjoin the FHFA when it exceeds its statutory authority. So the central question for this Court is whether HERA authorizes the conservator to siphon all of the company's net worth to Treasury and thereby permanently place them in an inherently unsound condition. It does not. The text of HERA, section 4617b2d, instructs the conservator to seek to put the companies in a sound and solvent manner, and soundness means capital for purposes of financial regulation. The net worth sweep is antithetical to FHFA's core conservatorship mission because it and retain capital. And the text of HERA, b2d, also charges the FHFA with conserving and preserving the assets, and the net worth sweep does exactly the opposite. This straightforward interpretation of HERA and section b2d is strongly supported by the text of 4513a1b. That provision states that one of the, quote, principal duties, close quote, of FHFA when it works as regulator shall be, shall be to ensure that each regulated entity operates in a safe and sound manner, including maintenance of adequate capital. HERA is not a statute that is at war with itself. If FHFA as to say that as conservator, it can disregard those same ends, and other circuits to have looked at this have simply ignored that textual point. The courts that have rejected our interpretation have done so largely because b2d says may rather than shall. We aren't saying, just to be clear, that may means shall. Rather, the question is what has Congress authorized the conservator to do, the Supreme Court in New York versus FERC said that in our constitutional system, an agency has no power to act unless and until Congress confers power upon it. And an authorization for an agency to do one thing is not authority to do precisely the opposite of it, and we don't have to speculate about that, because HERA says in 4617A4A that the conservator is not allowed to operate the companies in an insolvent way. It has to put them into receivership if they were insolvent. Now, you don't have to take our word for it on this interpretation. The FHFA, from its inception to the present, has over and over again said that this is a, quote, mandate, mandate, and that it is required, required to operate these companies in a sound, insolvent way. We collected these quotes at pages 31 and 32 of our briefs. The other circuits to assess this question have said nothing about these admissions because there is no answer to them. Now, our interpretation of b2d finds further support in the word conservatorship. This is a word that brings with it a long common law and statutory tradition of conservators operating financial institutions with the aim of restoring them to soundness, and our interpretation is further fortified by the text of 4617A2, which talks about the purpose of conservatorship being rehabilitation, and it's further fortified by the b2t that says that, that uses the term necessary. Now, it's clear elsewhere in 4617B that Congress used the word may to impose mandatory duties. If you look at b2b, Congress said that as conservator, FHFA may take over the assets and operate, and it may collect all the obligations and money due to companies. Does anyone doubt that they have a duty, a requirement to operate? They can't take over as conservator and say, we're not going to operate. So we know from the statute, we know from b2b that may can be a requirement, and it is in this statute, and Judge Brown in her DC Circuit dissent in Perry Capital explained the answer to the question, well, then why did Congress use the may, and she said, quote, it's best understood as a simple concession to the practical reality that a conservator may not always succeed in rehabilitating its word. B2d is also the only place where Congress talked about the ends of conservatorship, and that's important, because under the non-delegation doctrine, Congress needs to specify the ends. It's not simply enough to say you may operate. Operate toward what end? B2d answers that question. Now, wholly apart from all the points I've just made, we win under B11e, which imposes a mandatory duty. It says, quote, in connection with any sale or disposition of assets, FHFA shall, shall conduct its operations in a manner which maximizes the net present value return from the sale or disposition of such assets. The net worth sweep did not maximize the value of the disposition of assets. It essentially gave them away in return for nothing. Now, courts have also rejected our position by looking at B2j, but the text of that provision cuts our way. That provision limits the conservator's exercise of powers granted elsewhere. It says that FHFA as conservator may, quote, take any action authorized by this section. Authorized by this section. In other words, it's not a freestanding superpower. They have to show another part of HERA which authorizes this power, and even then, it says which the agency determines is in the best interest of the regulated entity or the agency. So this means that FHFA may only exercise its power as conservator conferred elsewhere in the statute if it first determines that the action in question is, quote, in the best interest of the regulated entity or the agency, not that it can do anything that it deems in its best interest. Other circuits to consider this have simply ignored that language. The text of B2j also goes our way because these are incidental powers, not freestanding superpowers. And B2j uses the term conservator. That is a term used 105 times in HERA. And Congress should not be understood to have fundamentally and radically changed the meaning of that term through an incidental power provision, which is clearly a limitation. In addition, their interpretation of B2j violates no less than four canons of construction. It exalts the general over the specific. It renders everything else in B2 surplusage. It hides elephants and mouse holes. And it creates massive constitutional liability in the form of a taking. Now, we also have claims against, statutory claims against Treasury. And Treasury violated its own obligations under HERA. The district court said that when Treasury contracts with FHFA, any claim that Treasury violated HERA is barred by 4617F. But it's uncontested that 4617F doesn't bar claims to enjoy violations of HERA by FHFA. And so Treasury's claiming even broader immunity than FHFA has. And nothing in the text of HERA confers such broad immunity. The critical point, too, is that under our claims against Treasury, FHFA itself is violating HERA. Take one example. We point to 1719G2D. This is a very clear provision that says Treasury cannot purchase securities of Fannie Mae and Freddie Mac after December 31, 2009. That ban on purchase of securities of Fannie and Freddie is just as much a ban on the sale of those securities by FHFA. And so both FHFA and Treasury are violating 1719G2D. Now, I'd like to turn to our constitutional claims. And this is the most unaccountable agency in the history of the United States, which is presumably why they've conceded that it's unconstitutional. Now, they claim we don't have standing. And there's a very easy way to cut through that, because both parties agree that if a plaintiff is, quote, directly subject, directly subject to the agency, then it has standing in a separation of powers case. And here our voting rights are being exercised right here and right now by the FHFA. It's hard to imagine a clearer way in which we are directly subject to an agency's authority when the agency is authorized to act on our behalf. Now, if the court did want to look beyond that and look at injury in fact and causation and redressability, we have all of that as well. With respect to injury for the first time in their in-bank brief, the FHFA suggests that maybe we weren't injured because our stock really had, quote, minimal value after the imposition of the conservatorship. That's wrong as a matter of law, in fact. As a matter of law, any economic injury creates Article III standing. And as a matter of that we were massively injured by the elimination of our economic rights. Now, with respect to causation, footnote 12 of free enterprise makes clear that we are, quote, not required to provide precise proof of what FHFA's policies might have been in a counterfactual world, close quote. And footnote 7 of Lujan, Justice Scalia explains procedural rights are different from a standing perspective and plaintiffs aren't required to show that the violation changed the agency's ultimate decision. Now, it's also important to realize that even if we were required to show what would have happened in a hypothetical world without forecast removal protection, President Obama, who did in fact support the net worth sweep, might would have had a very different set of incentives. Without forecast removal protection, this would have been an executive agency. It would have been an agency with $130 billion at its disposable for affordable housing or other administration policies. Policies which could have been promoted without having to go through the Republican controlled House of Representatives. The point is, President Obama would have had very different incentives. With respect to addressability, we have addressability both because we're entitled to vacatur and because of prospective relief. And I want to talk briefly about remedy. The APA, the text of it says, shall set aside unlawful agency action. They point to free enterprise and John Doe and Buckley. None of those are APA cases and we know from Boucher and Noel Canning and Lucia that in separation of powers cases, vacatur is appropriate. And the Supreme Court explained the reasons why were to create incentives for plaintiffs in Lucia footnote 5 and because it's void of omnisio, these conduct. Free enterprise looked at prospective relief. The court can avoid those severability questions by simply granting us the relief we seek, which is to enjoin the further implementation. And I welcome the court's questions. All right, you're open. Mr. Thompson, on the statutory point, it's interesting to me that all of the other, that have decided this issue and our panel as well, preface their discussions with basically the treasury and FHFA's explanation of how the net worth suite came about and why it came about. And that seems contrary to ordinary 12B6 principles where you look, accept the facts as they are My question is, did the complaint in this case plead a different or more fulsome statement of facts in favor of the plaintiffs than were presented to other courts? Yes, Your Honor, it did. The Perry Capital complaint that was filed back in 2013, I believe, was before there had been discovery. There was extensive discovery in the Court of Federal emails were ultimately produced and they did not become public until just a couple of months before this complaint was filed. So this complaint is fortified not just by suspicion and innuendo, but by specific emails from the defendants. It's also fortified by you make every allegation 10 times, but that's another matter for the sake of emphasis, no doubt. But well, so we are not at liberty to the same extent to simply accept the treasury's rationale that the agencies were facing imminent, a death spiral in 2012, which required the net sweep to be substituted for the PSPAs. Yes, Your Honor, you're exactly right. And I might add that not only do we have those factual allegations, but there's a legal flaw in their revisionist counter-complaint version of facts, which is the ability to pay in kind. Under the terms of the PSPAs, there was zero, zero threat to the line of commitment at any time because they were permitted that the companies were to pay in kind a dividend and that would have preserved every penny on the line of commitment they say. Also, that the reason they did this was to preserve the line of commitment. Not only do we look at the facts, it can't be true because there'd be $130 billion of capital right on the balance sheet today, standing between the losses that could be generated and drawing on the line of commitment. They actually, they actually say that there's no need for that, that both parties Well, they are trying to dispute them, but they are not material for the reasons I've suggested. Well, that is true since it's on a, you know, that's on a motion to dismiss. So where does that take us? Right. And where that takes us is there's no need for a remand here because under B2D, it says that the companies are to be in conservatorship, operated toward a sound and solvent manner. And there is no set of facts, even their revisionist history set of facts, under which this promotes soundness every quarter to siphon off the net worth in its entirety of the companies. So there's no reason. Summary judgment was part of it and part of it was motion dismissed. I'm sorry. Go ahead. Yeah. So, and one of the other points that they have made is about, and I'm turning now to the constitutional section, is they've said, well, these actions are not attributable to the government. But in the statutory part of the case, they have invoked B2J and they have said, oh, we were pursuing the agency's interests. That is a piece of kryptonite they have tied around their own neck and they should be stuck with because they've said, we're pursuing governmental interests. Well, if that is true, then they're the government, would be one point I would make. I would also say that we are challenging regulatory action because every one of these dividend payments under the net worth sweep had to be approved by FHFA as regulator. There is, this was, I'm sorry, you confused me. There were no cross motions for summary judgment though, right? Your Honor, so on the statutory claim under HERA, there was not a cross motion for summary judgment, but on the constitutional claims, there are cross motions for summary. Well, they've conceded that now, so. Yes, that's right. Okay. So that's minimal. But on the statutory, well, you just said something that, what is the difference between, I know what the net sweep accomplished, but is it not also the case that the PSPAs left Fannie and Freddie with an overhanging obligation to the government, which was not going to be reduced? Oh, Your Honor, I think that the facts show that. Because it had a $1 billion liquidation preference and it had a million shares of the senior preferred stock. But what that initial deal did permit is for capital to be built up. So to the extent they could make the dividend payment of 10 or 12%, depending on whether they pay it in cash or in kind, and they made more, and we know over the last six years, they've made about $130 billion more than they would have. But for the net worth sweep, that $130 billion of capital would be right there on the balance sheet, helping to ensure the soundness, helping to protect the line of commitment. One of the courts who rejected the statutory argument said that the proof is in the pudding here. The companies are still solvent and operating, and therefore the net sweep has not effectively substituted for a receivership. Yeah, and that court ignored the word sound. It says sound and solvent. And under 4513A of the statute defines what soundness means. It means adequate capital. And there is not adequate capital. Now, all right, so this gets into the situation about derivative versus individual rights. Because to the extent that the claim is that there is not adequate capital, to me that goes to the soundness of the institutions, but not necessarily to the injury or the rights of the companies soundness has been undermined, but the plaintiffs have been injured directly and unequivocally in their own shoes because their economic rights have been vaporized. They've essentially been taken out of the capital structure so that every penny of profit will go to the government. That's an injury that's been visited directly on the plaintiffs and under the Treasury Department and the FHFA under both administrations from the net worth sweep have shared the objective of disentangling Fannie and Freddie from so much involvement in the residential mortgage market. Is this not a goal that they were entitled to pursue? Is that your position, or is it just it was not they couldn't pursue it by this device under 4617? The latter, Your Honor, that they are not permitted to siphon off the capital, hobble them, make them fundamentally unsound, make them so they can never be rehabilitated. If they want to shrink the footprint, that's fine, they can do that. If they want to put them into receivership provided the statute's criteria are met, they can do that. But they haven't in fact shrunk the footprint, have they? Oh, they have, Your Honor. The companies have many hundreds of billions fewer in assets on their balance sheet than they previously did. But that feeds into your position that they're better quality mortgages than they were before. There are better quality mortgages than there were before, but the reality is you still need capital on your balance sheet. And one of the things they've suggested is that the line of commitment is capital. We know that's not true because the PSPAs say they're not capital. We know it's not true because it's not on the balance sheet. I want to get back to the Constitution claim. If we end up not, if we end up agreeing with all the other circuits on the statutory claims to other companies, and I want to be sure I understand it. Would you walk me through your current proposed remedy, assuming that we find we can't reach the statutory stand, but we find the problem of the four-cause removal issue. I mean, walk me through the exact remedy you are seeking. Yes, Your Honor, and I'm going to do that in two parts. I'm going to address it backward-looking and then forward-looking, because that's really important that it's a two distinct, they're trying to blur this, but they're two distinct questions. So backward-looking would be an accounting adjustment that makes clear that the government's liquidation preference has been paid back with the 10 percent interest. We put the calculation in the appendix to our supplemental brief and no one said we did our math wrong. And so that would then eliminate the liquidation preference. The government would still have 80 percent of the common in the form of warrants, so that it still had big upside remaining, and this would be one of the most profitable investments in U.S. history for the government, number one. And then going forward, they would be enjoined from any further implementation of the net war sweep. They couldn't start as the capital. Not just you, you were... That's, that is true, yes. And then explain to me how that gives respect to the President's choices. It doesn't look like we're asking the President anything in that sequence. Well, Your Honor, what the Supreme Court has consistently done, and we see this in vacated, on a backward-looking basis, conduct that... No, well, sometimes they have sent back, certainly Bauscher wasn't... There's no way for the current President with the new acting director to ratify the net war sweep. It was void op ognisio, so we would say it cannot be ratified. Now, they could try to reissue it, so they could say, okay, wholly apart from what happened in 2012, we're now in 2019, we're looking at the facts, and, you know, we're going to take a fresh look at that. You just cited a number of... Sorry, Your Honor, your time's winding down. Yes. Cited a number of cases where past agency action was vacated. Yes. Can you cite any cases where past agency action was vacated, where the constitutional problem was that the President was limited to for-cause removal? Well, I think that the best one is Bauscher, because it wasn't for-cause removal, but it was a removal case, because the Congress had been injected into the process in violation of Myers. I'd like to save my rebuttal time if I may. All right, one just real fast question from me. Just do I understand you're saying on the backward look, essentially the relief you're looking for is the accounting slash sort of bookkeeping, no money exchange? Yes, Your Honor. All right, didn't mean to oversub, but that's what you're saying, right? That's it, Your Honor. Got it. My only question. Thank you. All right. Mr. Caterberg. All right. Good morning, and may it please the Court. Rob Caterberg on behalf of FHFA. Your Honors, neither plaintiff's constitutional claim nor their APA claims provide a basis for invalidating the financing arrangement the conservator reached with Treasury. Now, there are a number of legal issues I need to address, but at the outset, I just want to say the rhetoric that you've heard about this transaction bears no relationship to reality. The PSPAs were a vehicle by which the taxpayers of the United States infused nearly $200 billion into these enterprises to enable them to continue to perform their function of ensuring the viability of the U.S. mortgage market. In 2012, there was an amendment that entailed an exchange of consideration between the conservator on behalf of the enterprises and Treasury. So Treasury gave up something known as the periodic commitment fee, which was looming on the horizon, and everybody knew it was going to be huge because it's a fee for a commitment of up to— Can we clarify something just at the outset here? Is it the FHFA's position now before the en banc court that, in fact, the agency is unconstitutionally structured? That's correct, Your Honor. Under the new leadership, which took over earlier this month, the agency has reevaluated its position and it is no longer prepared to defend the constitutionality of the forecast reviewable provision. And so what do you think should be done about that over here? Your Honor, we don't think plaintiffs have standing in this case to raise the issue for reasons of traceability and— If we disagree with you on standing, what should be done about that? If you disagree with us on standing, then the result would be essentially what the panel did in this case, which is to limit the remedy to severing the removal forecast provision because in any event, it would not provide a basis for backward-looking vacature. The transaction does not become void ab initio simply because there was a forecast removal provision on the books at the time. Why not? You just said, why not? Because it's never been done before, Your Honor. There's no court that's held that because a removal restriction was in place, a forecast removal restriction, that rendered agency action while that statute was in effect void ab initio. Things like that have been done in the Appointments Clause context, but that's an entirely different context because with the Appointments Clause problem, the violation is that the official is sitting in the chair taking action in the first place. With a removal restriction, there's no challenge to the ability of the director to act. The issue is the impingement on the president's ability to remove that individual, and the plaintiffs here have drawn no connection between that issue and the injuries of which they complain. I just want to understand, we've had two different presidents who, let's just say, don't agree on everything, and yet we've had three different directors, an acting director, an appointed director, and then now another acting director, and none of them have said the net worth sweep should be undone. The FHFA has consistently supported the Third Amendment. We think it was an exercise of conservative authority to continue this funding mechanism. Right, but what I'm saying is we have the benefit of knowing that these directors that are coming on board, one of them was appointed by the prior president, one of them is the acting director under the current president, neither of those two acting under very different presidents has said we should undo the net worth sweep. So if we, the Court, are trying to show respect to the office of president, we wouldn't be doing that by undoing the net worth sweep. Is that a fair? Well, that's exactly right, Your Honor, and it goes to our traceability argument. You agree that if we hold for the shareholders on the statutory claim, the sweep must be unwound. Do you dispute that? If you were to hold for the shareholders on the statutory claim, I suppose there would be some sort of remedy that would involve whether it be vacating it or setting aside whatever you call it. I do not think in any event it would provide a basis for doing the sort of elaborate recapitalization that you heard counsel suggest. That would be a further issue, but there would be some remedy there. Would we need to remand it to the district court in order to determine, because this hasn't been fleshed out, the proper remedy for the statutory? Would that need to be taken up in the district court in the first instance? If you get to that point, I think that might be necessary, but I'd urge the Court that there's no reason to split from five of the Court's sister circuits. Let me ask you a question about that, because I thought the basis for claiming that this is not an action of a conservatorship was fairly strong, and that's because I was involved in, several of us were involved in a number of cases back in the last banking crisis of the late 80s and 90s when FERIA and FDIC came in as conservator. Is there a single case in which one of those entities as a conservator was basically transferring all of the equity or the net capital of the company back to the Treasury? Yes or no? Your Honor, I don't have a case at hand, but I have a similar case I'd like to refer Your Honor to, which is the Ward case. So this was Ward versus RTC, a 1993 decision. It involved the FDIC equivalent, the FERIA equivalent provision of the net present value provision in here that your counsel referred to. And what happened there is that the receiver for a failed financial institution sold an asset. But that's a receiver. The provision of this particular provision applies the same way to a conservator receiver. Somebody came in and said, I wanted to buy that asset and I would have paid a lot more money. And this Court said that's not for the Courts to sue. Now you're going over to 4617J about the anti-injunction. And no Court has held that the, none of the Courts that have decided this issue, well, what they have decided is that as a preface is saying 4617J applies, that your agency was well within the statutory bounds. And what I'm asking, that's not the question I'm asking. They are a conservator and is there, and you, there is no case, as goodness knows, you all have been down this road six or seven times together now, never come up with a case where a conservator effectively took all of the net capital out of one of the lending institutions that it was purporting to conserve and gave it to the government. I have a couple of responses. For I don't have a case, but that's because there's nothing, there's been nothing like this in terms of the type of rescue that was needed. Well, there's very little that's, nothing except the total novel creativity of the regulators here. But what I'm suggesting is that because the language in this statute is almost verbatim the same as that in the preceding situation, you may not remember how horrible the bank failures and savings loan failures were back in the late 80s. But many people were wiped out as a result of that. And I didn't see this kind of extreme measure being taken. The, maybe this measure didn't need to be taken in that, in that situation. But these entities are essential. So this comes down to simply necessity? I mean, this is, that's the basis? I mean, you'll certainly, you'll concede that there's a difference between receivership and conservatorship, won't you? There's a difference between receivership and conservatorship, but the powers that were exercised here to enter into the Third Amendment were conservator powers. They involved taking over the assets of and running and operating the institution and taking action to maintain this commitment for up to a quarter trillion dollars. In perpetuity. As I understood the other circuit opinions, including the position here in perpetuity, taking the net worth sweep is something that is ongoing into the future. Is that correct? Well, there's, there's no fixed termination date on it. Policymakers will have to decide what the future of the, how we're going to do the secondary mortgage market in this country going forward. And that, that will be addressed in due course. But how does, how does, how does siphoning, how does siphoning the company's net worth quarter after quarter in perpetuity achieve the statutory command of putting them, quote, in a sound and solvent condition? Well, and I need to quibble a little bit with the siphoning. We, I mean, it's, it's, this is an exchange of consideration. There's, there's billions and billions of dollars come in and many billions, potentially more to come in. And as, as any lender would want, there is consideration for that. And so siphoning is a bit of a label, but under the previous... Treasury isn't a lender. It's an equity holder. It's an, it's an equity holder. That, that's fair, Your Honor. But they still merit compensation for the extraordinary commitment that's been provided. But they've been repaid. They've been repaid how many billions? More than the 80, 189 billion, which represents their current interest in the company. Not, not exactly, Your Honor. They haven't been repaid. The payment of the dividends is not considered to be repayment of principal. That's very clear in the... That's because the, as I read the thing, but again, you have principal and you're treating the dividends as interest. The dividends are the income that Treasury is entitled to. Right. I mean, you're trying... But it doesn't reduce the, the, the amount of the equity. So Treasury hasn't been repaid. In fact, the, the agreements, this is the original agreements I'm talking about now, not, not the Third Amendment. Had this been, had this been a straight up loan, it would either be fully paid off or close to it. Well, not, not, not really, Your Honor, because with a straight up loan, you could have an interest only loan, an interest only mortgage. And the, the, the level of commitment that Treasury provided is so extraordinary and so unprecedented. There's really nothing like that. Treasury gets compensation for that. It can come in the form of dividends for the continuing commitment. It can come in the form of the periodic commitment... Well, what it really, what it really comes in the form of, it seems to me, is Treasury taking over the reins of the decision making as to the quality and type of mortgages that are going to be financed. Well, I, I wouldn't quite agree with that, Your Honor. The conservator exercises its judgment as to the operation and the running of the institution. That's not for Treasury, but Treasury does provide... The conservator has less and less to work with, however, right? Because the capital is so low that the conservator's options are quite narrow. Still, still a lot to work with, Your Honor. If you look at the Perry Capital decision, 864F3rd at 610, the D.C. Circuit noted that up between the Third Amendment and the date of that decision, which was 2017, the enterprises had purchased over 11 million mortgages, issued over 1.5 trillion in mortgage-backed securities, and that number, of course, would be even much higher now because it's now 2019. So these entities are still very much in operation. Treasury is not dictating how the enterprises are being run, but it is providing this critical capital backstop. In exchange, there's consideration for that. There was one form of consideration prior to the Third Amendment. There's a different form... And you say the statutory... So it's your position that FHFA... Actually, you didn't really argue the statutory issues that much in your brief. You were going after standing so much. But, see, your position is that FHFA can achieve its goal by basically freezing out the interests of the private shareholders altogether. Well, Your Honor, it's not freezing out the interests of the private shareholders. The interests of the private shareholders were effectively gone with the original... But that assumes facts that are not in the complaint. It's not factual, Your Honor. It's a legal conclusion that flows from the fact that the conservator succeeds to the shareholder rights, number one, and because there's judicially noticeable documents, transaction documents, in the form of the original preferred stock purchase agreements that gave Treasury so many rights that these shareholders were so far underwater that they were effectively at the bottom of the ocean. Counsel, before your time runs out, Counsel, could you get to the traceability standing argument? You've hinted at it twice. Could you just take 30 seconds to outline? Certainly, Your Honor. So we have two traceability arguments. And traceability, as you know, is that for Article III standing, they have to show causation. They have to show that the violation caused their injury. There's two reasons why that doesn't exist here. First, FHFA had a temporary acting director at the time of the Third Amendment. And acting directors do not have the protection from arrugal without cause that the plaintiff's claim revolves around. The statutory text is very clear. It includes for-cause language in one subsection and excludes it in another. The contrast is night and day. And if you needed any further reason not to read for-cause removal into the statute as an implied matter, the canon of constitutional avoidance would come into play. So if for-cause removal is constitutionally problematic, and I'm not here to resist that proposition today, reading it into a statute as an implied matter is about the last thing a court should do. But aside from the acting director not having for-cause removal protection, if the violation didn't exist, excuse me, that's only half the traceability problem because the transaction here was a joint transaction taken together with Treasury, which everyone agrees is under plenary presidential control. Article II does not say in so many words that the president needs to have removal at will power because what it's all about is ensuring that the president has the ability to oversee the executive branch. And if the president had the ability to oversee whether this particular transaction took place by calling up the secretary of the Treasury and telling him not to do it, then the purposes of Article II are accomplished. Counsel, I still am not clear. I'm over here. I'm not clear on how it doesn't state a claim that did not promote soundness. Basically, Judge Willett's question earlier that we moved on from, why shouldn't that proceed? Well, Your Honor, it promotes soundness in the fact that the enterprises never have to worry about not having enough money to perform their critical functions because at the end of every quarter, if they have a net worth deficit, Treasury comes in. But that's not the definition of sound, is it? In the statute. It serves the same purpose as soundness because... But they didn't say alternative to soundness. They said soundness as a definition. Why isn't this like whistleblower in the Dodd-Frank? And when they said whistleblower, it meant whistleblower. Soundness means soundness. Well, when the conservatorship started, it ushered in a whole new capital paradigm. So when the conservator takes over and enters into this relationship with Treasury, the safety and soundness requirements don't apply the same way that they would outside of conservatorship when FHFA is simply acting in a regulatory capacity. There is no reason for concern that these enterprises will be short of capital or unsound. But don't you have to look way outside the complaint for all of that? No, Your Honor. We think this court should go with the decisions of the other five circuits that have said that in order to determine whether the protection afforded by 4617F applies, you have to look at the nature of the transaction. There's more than enough in the record. All the transaction documents are there. The numbers, the amount of draws that the enterprises have taken under this arrangement, they're undisputed. And we think if you do that, you'll see that this is a quintessential sort of business transaction of the sort that conservators engage in. What the plaintiffs are essentially here to do is to complain about the fairness of the merits of the transaction. They think that the conservator made a bad deal, and they're free to dispute whether the exchange of value was as favorable to the enterprises as it could have been. But Congress couldn't have been clearer in the statute that it did not want courts getting involved in that kind of determination. All right. Thank you, counsel. You've got a red light. You're from the Treasury. May it please the Court. I'd like to make three points today. The first is I'd like to address the succession provision and why that bars both the statutory and constitutional claims. The second, I'd like to address the statutory claims and address some of the questions we've discussed this morning. And the third is I'd like to address the remedial question, which for both the statutory and constitutional claims, why it would be improper to set aside the Third Amendment. Let me start with the succession provision. It is clear that the succession provision, and they don't dispute that in general, the enterprises in the FHFA. And the claims they are making here today, both their statutory claims and their constitutional claims, are clearly derivative in nature. Judge Jones, as you pointed out, what they are arguing is that either because of a violation of Article II or because of a violation of HERA, assets of the enterprises were taken away from the enterprises and dissipated. That is a claim of a violation of the enterprise's rights, and it is an injury to the enterprise and the relief would be a return of capital to the enterprise. None of that is a violation of the shareholders' rights as shareholders. Their only argument is that because the enterprises have been injured, they have suffered derivative financial injury. That is true whenever anything happens bad to an enterprise. Of course, the vehicle for doing that is the very clause that you're talking about, which is the succession clause, which means that all their rights were given to the government. Right. So I'll say a couple of things about that. The first point is, for their statutory claim, that's utterly besides the point. If they're statutory claims, Congress can create the rights, Congress can create the remedies or provide no remedies. There's not any textual basis in the succession provision to say that because the claim at issue is a claim against the FHFA, somehow the succession provision doesn't apply. Well, maybe that's because there's never been a case like this where the government used the succession provision to take all of the capital, to suck the capital out of the institutions. It's not all that unusual for shareholders to argue that conservators or receivers have done improper things. This court had, for example, the Ward case, where there was a challenge that a conservator or a receiver in that case had acted improperly. It doesn't change the fact that that is a claim of injury to the enterprise, and therefore it is covered by the succession provision. As to a statutory claim, they have no basis to get out of the text of that statute. Now, as for their constitutional claims, they have tried to argue that there's somehow a constitutional problem, that taking what is the enterprise's claims against the FHFA, investing it in the FHFA somehow is a constitutional problem. And there are two fundamental problems with that argument. The first is, the enterprises were not precluded from making the constitutional claim that they are raising here today. The constitutional claim they are raising is that there's a problem with the structure of the agency. And if the enterprises wanted to make that claim, they could have. When the enterprises were put into conservatorship, under the statute, under 4617A5, they could have challenged that decision, and they could have challenged it on the exact basis they're making today. The enterprises made the— Well, actually, that's not true, because the Third Amendment sweep came five years later. But their constitutional claim has nothing to do with the precise details of the Third Amendment. Their only argument on the constitutional claim is that the FHFA is unconstitutionally structured. And that claim, they could have made in the initial 30 days in a challenge to the conservatorship. They chose not to make it. That was their entitlement to do so. That is the entire point of the separation between enterprises and their shareholders. They are perfectly happy with the fundamental bedrock principle that they're not on the hook for the enterprise's liabilities. When in 2008, the enterprises lost $108 billion, no one was trying to come into their pockets for the last— Well, they're shareholders. That's exactly the point. So is the Treasury Department. They have to take the bitter with the sweet, Your Honor. So is the Treasury Department. It's a shareholder. That is true, Your Honor, too. But the point is they have to take the bitter with the sweet, just like they are not on the hook out of their own pockets for the losses of the enterprises, so too they cannot sue on behalf of the enterprises. It is the enterprise's claim. Well, I understand what you're saying, and we'll let them respond to it. And then the last thing I would say on the enterprise point is even if you thought that there was some problem with the fact that the enterprises could only have brought that claim for 30 days, that would at most suggest that there is a problem with the succession provision as applied to the enterprises. It would suggest that today the enterprises should be able to come and make the constitutional claim that they have brought. The enterprises are separate entities. They have a board of directors. They have officers. They could have brought the suit if there was some sort of constitutional succession provision. There is just no basis to blow up the succession provision and say individual shareholders can bring a claim based on what is simply nothing more than an injury to the corporation. And this Court in Gregory v. Mitchell held exactly that. In Gregory v. Mitchell, it was a claim by shareholders of a bank saying that it had been improperly taken over and the assets had been improperly dissipated, and they said it was a due process and equal protection violation. And this Court held that that claim was barred by the bedrock principles of shareholder standing. This claim is no different from that. So if we're right about that, that takes out, as I've described, both their statutory and constitutional claims. But you've agreed that there's a constitutional violation here. We agree that the FHFA is not constitutionally structured.  You're basically raising standing again? We're not making the argument as a standing argument. We're making it in two different ways. Our first point is that the succession provision means that they don't have a claim. They are not the right plaintiffs to bring this lawsuit. Our second argument for the constitutional stuff is that for three different reasons, as we outlined in my brief, they are not entitled to the relief they are seeking, both because this was taken as a conservator rather than as a regulator, because it was taken with an acting director who was in fact removable as well, and also the remedial. And I would like to get to that later in the argument, but I would like to turn first to the statutory questions, though Judge Oldham might think— Before we move past the succession provision, no one's bringing a constitutional claim against Treasury, right? The constitutional claim only goes against the FHFA. That's correct. And when was the first time the FHFA raised the succession provision as a bar to constitutional relief? So we—I'm not sure about the FHFA, but the Treasury Department, our motion to dismiss in this report moved to dismiss the whole case and all the claims, and we invoked the succession provision. It wasn't somehow limited to the APA claims against us. And of course, don't forget, the relief that they are asking for is to blow up the Third Amendment. And so we had every right to move to dismiss the entire case on the basis of the succession provision. In the beginning of the motion to dismiss, the Treasury file says the APA claims that were brought against Treasury, which makes sense because no one was bringing— No, so I don't think it is—I believe FHFA's motion to dismiss consistently listed that it was moving to dismiss the APA claims. I believe Treasury's motion to dismiss just said the entire case and all the claims should be dismissed because they were barred by both 4617 and the succession provision. So your friends on the other side say that the first time that the FHFA raised the succession provision as a bar to constitutional relief in this case was in their merits brief before the panel, and therefore it is forfeited. Yeah. So I'm not sure if that's right or not, but I do know that the Treasury Department's motion to dismiss raised the succession provision and it was not limited to the—it said motion to dismiss, case over, all claims, and we raised the succession provision. But of course, as we just discussed, there was no claim for constitutional relief against Treasury. But they were raising a constitutional claim to blow up a contract to which we are a party. We had every right to say the entire case should be dismissed because the constitutional claim that they are asserting would blow up a contract to which we are a party. So we had absolute right to move to dismiss that count and that claim for relief, even though the basis on the merits is a claim about FHFA structure, not Treasury structure. If I could turn to the statutory claims, I think there are two points at a large level that I want to emphasize, one on the law and one on the facts. On the law, the critical point is the question before this Court is not whether the members of this Court think that the FHFA improperly exercised its conservator functions. The question is whether the FHFA was acting ultra vires, whether, as this Court recognized in the ward, there is a fundamental difference between the agency acting wholly outside of its authorities as a conservator, whereas, on the other hand, whether they have improperly exercised their conservator functions, either imprudently or maybe even unlawfully. I think it's important to emphasize that if you look at this Court's decision in the ward, it says that once you're exercising your conservator or receiver functions, even if you exercise those functions unlawfully, it is not subject to review. So if the agency exercised its conservator functions and said we're not going to give any more loans in low-income neighborhoods because they were calling themselves a conservator, that would be non-reviewable, or that would be not ultra vires. I think the question would be whether it was a colorable exercise of one of their conservator functions. I would think something like that probably would. The hypo is a little difficult because I'm not sure that they actually— Well, they could make the argument that as a matter of safety and soundness, you can't make loans in low-income neighborhoods because they're more likely to default. It's just a little confusing because Fannie and Freddie don't actually originate loans. Buy loans, you know, insure loans. So if I could focus on the facts of this case— No, sir. I'm asking you because you're saying that even if it's imprudent or unlawful, it is still within the authority of the conservator. And what I'm suggesting is that the Court—I'd be the first to concede that it is not our We understand what conservator is about, and we can parse this statute and say taking all of the capital out of an institution that is supposed to operate on the basis of a minimum amount of capital like a bank is not within the powers of a conservator. And so here's why I don't think that's right, Your Honor. Even if you focus on the preserve and conserve assets language that they have focused on, that language does not say that the only actions they can do are things that in fact do preserve and conserve the assets. That provision itself— And see, that's turning language topsy-turvy to me. In other words, we are statutorily charged with preserving and conserving, and we're supposed to take what actions are necessary and appropriate to those ends, but we don't really have to— I think you're misunderstanding what I was going to say. I'm not making the argument that they keep fixating on that it says may, and that means we don't have to do it. No, I understand what you're— I was making a different argument, which is that— I know, which is worse. So I don't think so, because I think the point of the argument is it says that may be appropriate for safety and soundness in the preserve and conserve assets. In other words, the statutory language itself recognizes that these are difficult economic judgments that have to be made, and it's not up to courts to second guess whether they were right or wrong. As long as it may be appropriate and necessary for safety and soundness in the preserve and conserve assets, it's within the function of the conservator. Now, let me explain why that was the facts here. It is not disputed in the complaint that— two points. Under the PSPAs, the enterprises owed $18.9 billion in dividends a year under the Second Amendment, an amount of money that was more than they had ever made in a single year with one exception. What that necessarily meant was that every year, year in and year out, they were likely going to have to either dip into their assets or, more importantly, dip into the commitment to fund that. It is certainly within the realm of reasonable exercise of conservator function to say, we are going to prevent that from happening. The commitment was critical. This is where you're going outside the corners of the complaint, because unlike the other cases, which have accepted that assumption of what Treasury was trying to accomplish, that is not what they're saying here. But that's the critical point. It's not about their subjective motive. The cases are legion that you don't— It's not a question of motive. What are you saying when you're saying they're in a death spiral? What I'm saying is that as an objective matter of fact, and they don't dispute it and their complaint doesn't dispute it, they owed more in dividends a year than they had ever made in assets, in income. That is objectively true. Yes, but then they're saying that at the point of 2012, it was clear on the horizon that the golden years were ahead, that there was going to be a $50 billion reversal of some tax write-off, and that they were about to— and that, in fact, in that year, they had turned the corner economically. That's right. And that is just second-guessing the Conservatives' judgment about whether to do that or what the Conservatives— But they're allowed to plead that, is my point. Right, but the question as a legal matter is not who's right about that economic judgment. It is even if it were true that the horizon were about to change. The Conservator is not required under the statute to have their view of economics. The question is whether it may be appropriate and may be necessary to safety and soundness. We're about to run out of time. Can you tell us about Remedy? Yes, so the most important point I would like to make about Remedy is we don't agree with either the plaintiffs or FHFA about— because they both basically take bright-line rules. The plaintiffs seem to think that if they've shown a constitutional violation, they're automatically entitled to vacate. FHFA suggests that they're never entitled to vacate in a removal case, and we think the right answer is in between that. The right answer is, as in all cases, this court has equitable remedial discretion. Plaintiffs try to suggest that's not true, that somehow the APA strips this court of its discretion just because it uses the word shall. And if you look at—we cited in our briefs a case called— So we have the discretion to do the net worth sweep? It's—whether to vacate the Third Amendment based on the alleged constitutional defect is a remedial question. This court, as always, has remedial discretion about— we know, we don't think you should. For three reasons that we gave in our brief, we think that there'd be massive reliance, interest, and disruption from vacating the Third Amendment years after. We think that's particularly problematic because they waited four years to bring the suit, and so latches and latches like principles strongly support it. And the third is, in this case, on the other side of the equities, they're bringing an Article 2 claim that the president's— But we know that the president, since the Treasury Department was the counterparty to the Third Amendment, didn't have a problem. And that's why so many friends of the Obama administration were editorializing that Mr. DeMarco should be fired. Whatever they might have thought about Mr. DeMarco in general, we know they don't think that the president would have nixed the Third Amendment. And that has nothing to do with the fact that the FHFA changed its position on the unconstitutionality of the appointment in its final argument before this court. That might be true, Your Honor. But again, for purposes of whether there's a problem with the Third Amendment, we know that there are claims in Article 2 claim that the president was somehow— his control over this was infringed. Can you address the remedial issue in the context of the statutory claim and also whether or not it needs to go to the district court in the first instance to exercise any of this discretion? So our first point is that our remedial argument— This is your last question, so— Okay. So I have two points in response to those two questions. Our first point is our remedial argument applies equally to both the constitutional and statutory claims. And if you look at the case we cited in our brief, the Weinberger case about how you don't lightly assume that equitable discretion is removed, that case cites a Supreme Court case called Hecht v. Bowles. It was decided in 1944. It rejects the exact argument they're making here. In that case, the statute said you shall grant an injunction, and the Supreme Court said, that doesn't strip you of equitable discretion. That case was decided three years before the APA was enacted. So Congress didn't think that when they used the word shall in Section 706, that stripped the court of equitable discretion. The second part is you asked me whether I would have to be remanded. We don't think it needs to be remanded. We think it is sufficiently clear that it would be an improper exercise of equitable discretion to set aside the Third Amendment for all of the reasons I mentioned that we said in the brief. But at a minimum, we think it would be entitled to remand. I can make one last point related to that. I think it's very important. They said today that what they want, their backward-looking relief, is these accounting entries. Those accounting entries are clearly improper under the term. It says they do not dispute in their reply brief. If the dividends had not been paid to treasuring, that does not mean it would have paid down the liquidation preference. If it hadn't paid down the liquidation preference, treasury would still be entitled to $18.9 billion year in and year out. They are trying to rejigger the terms of the agreement. This is just one of many reasons why it is wholly improper to use this sort of removal claim to set aside a complex commercial contract years after the fact. All right. Thank you, sir. You're welcome. Mr. Thompson was about to fall out of his chair to get up there, so I didn't want him to hit the floor before you got. So anyway, you got your last word. All right, Mr. Thompson, you're back for your rebuttal. Thank you, Chief Judge Stewart. So on that last point, the suggestion is they wouldn't have been allowed to pay down the principal. Every infusion of capital by the United States government in 2008, the purpose was to have the money repaid. So there's no reason for this speculation, totally unadorned here, that they would not have allowed the pay down of principal, number one. Number two, in terms of the question of remand, Judge Elrod, they had a hundred pages of briefing between the two of them to tell this court one way in which this would be unworkable, and they came up with nothing. They also had a hundred pages to tell this court how there was anyone who was actually relying on the unsound zombie-like status to which they had assigned these companies. They haven't pointed to anyone who will be prejudiced by restoring them to soundness and health. There was also a question, Judge Elrod, about whether this is fundamentally unsound, what they're doing. And 4513 shows that soundness means capital. And these companies have been deprived of their capital. And the notion that this line of commitment is capital, it's the difference between cash in your pocket and a credit card. A credit card is not capital. They're trying to pretend it is. Director Watt said it wasn't, the PSPA said it wasn't, and the statute. What is the effect of this being not necessarily in perpetuity? This is, like all the First and Second Amendment, this is a stopgap until there's some sense that we have reached some balance, and then the Third Amendment gets changed by the Fourth Amendment. Why can we rely that this is in perpetuity? I think the text of the APA, Your Honor, answers that, because it says, shall set aside. And it's a little ironic they're now saying shall means may. But the APA says that this court is obligated to, is mandated to set aside unlawful action. It's true any time there's an unconstitutional action visited on one party that the government can change its mind. And if it does, then there'd be questions about mootness. Excuse me, my question really is going to, if it's unconstitutional, if it never allows them to become sound, if this is a stopgap to deal with the infusions of cash that have been necessary from Treasury, until there is some stability in the market, which I would like to think we're in, maybe not, and then it gets changed. Now, there's no impetus here, perhaps, suggested that it will be changed, but it does seem to me that factors in somehow. Well, Your Honor, I think the way to think about it is to look at B2D, and it says that they're supposed to operate the companies in a sound and solvent manner. So in this interim period, where they're trying to figure out what to do, they need to focus on soundness. That's what B2D says. That means capital. They've done the opposite of that. They've done something, to answer Judge Jones's point, that's never been done in American history. There has never been a conservator that has come in and taken out all the capital. It says in the name of it, conserve, conserve and preserve. They're doing the exact opposite. Well, there's nothing in the Third Amendment that suggests that it is not a permanent provision. That is right. That is absolutely correct. Judge Jones, you asked my friend, Mr. Kederberg, whether they've been paid back, and the answer is, yes, they have. They've gotten $292 billion of dividends, and that's a $93 billion profit that the companies have. There was discussion about the succession clause and whether our claims are derivative. Our economic rights have been vaporized, and Congress gave us the right to bring this claim in the APA. There was a suggestion that somehow the companies could have brought a suit, a derivative claim, in the first 30 days. Obviously, the companies didn't have a crystal ball about the network sweep. We were told that the Department of Justice indicated that we were likely to need to make a draw. That is contradicted by the complaint. We are here on a motion to dismiss on the statutory claims. Moreover, as a matter of fact, the companies knew and the government knew that they were on the verge of massive profits. There was a suggestion that, well, you blind yourself to the purpose. Well, 4617A2 says, for the purposes. There was a question about whether we need a remand, and as I've indicated, there was 100 pages, and there was no impediment given to the suggestion that we make. And finally, Judge Haynes, your question about what the presidents have done. Our point is this, that if the for-cause removal is stricken, then the presidents face a very different situation than they have to date, because instead of having this $130 billion that they can't touch because it's an independent agency, it would be $130 billion that the executive could tap for affordable housing or other administrative priorities. It's not at all clear President Obama would have done this. We don't, that's not our burden. The director that he appointed didn't do anything to undo the networks. Well, and that's a key point. For five years and did nothing. He appointed him, but he had to select him from one of the three deputies, which were put by Lockhart. I'm not the acting director. I'm talking about the appointed director who came in after Watt. Mel Watt. Oh, Mel Watt, yes. And he was appointed by the president. And he would have come in and been told, I'm appointing you, go in there and deal with this network. Well, we know that he didn't want to reverse it. That is true. So I have no... All right. Thank you, counsel and the case. Lots of paper, lots of briefings, lots of arguments. We appreciate the assistance you've given the court. The case will be submitted along with the earlier one. This concludes this session of the Inbank Court.